IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAURA HARDNICK, as Special | ) | |
| Administrator of the Estate of Britteny | ) | |
| George, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 07 C 1330 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED MEMORANDUM OPINION AND ORDER**

Plaintiff Laura Hardnick, as Special Administrator of the Estate of Britteny George, brought this action under the Federal Tort Claims Act ("FTCA") following the death of her 13-year old daughter, Britteny George. The complaint alleges that Britteny's death was caused by the negligence of a doctor practicing at the Lawndale Christian Health Center. The United States is the Defendant in this action because the doctor whose treatment is at issue, Dr. Ann Dominguez, worked at a health care facility operated by the United States, and thus, pursuant to the Federally Supported Health Centers Assistance Act, 42 U.S.C. § 233(g)-(n), Dr. Dominguez is deemed to be an employee of the United States Public Health Service for purposes of this lawsuit.

This case came before the Court for a three-day bench trial in December 2008. At trial, the Court heard the testimony of several witnesses, including Ms. Hardnick, Dr. Dominguez, and other Lawndale personnel. The Court also heard the testimony of four expert witnesses – two per side – on issues relating to the applicable standard of care and whether the alleged negligence proximately caused Britteny's death. The Court sets forth below its findings of fact and

conclusions of law, as required under Federal Rule of Civil Procedure 52(a). The facts are drawn from the documentary record in the case and the evidence and testimony presented at trial.

## I. Background

### A. Events leading up to Britteny's October 26 visit to Mt. Sinai Hospital

Britteny George was born on September 19, 1990. The events leading to her death at the age of thirteen took place in late October and early November 2003.

On October 23, 2003, Britteny complained of a headache, took a pain reliever, and went to bed. Tr. 209. The next day, a Friday, Britteny felt well enough to go to school. *Id*. The following day, the headache returned, along with a runny nose. Tr. 210.

On Sunday, October 26, 2003, Britteny complained that she had a bad headache and that the light was hurting her eyes. Tr. 210-11. Britteny's mother, Laura Hardnick, drove Britteny to the emergency room at Mt. Sinai Hospital, where Britteny was examined by Naveed Hyderi, a physician's assistant. Tr. 160-62; PX 1. The notes taken during the examination at Mt. Sinai Hospital indicate that Britteny complained of a constant, throbbing, "frontal" headache of three days duration causing a pain level of 7 on a scale of 1-10. PX 1. The records from Mt. Sinai also reflect that the headache was worse when Britteny bent down, that she had a stuffy nose with yellow mucus, and that she had vomited once the prior night. *Id*. The physician's assistant diagnosed Britteny with a migraine headache and an upper respiratory infection, prescribed ibuprofen and Sudafed, advised Britteny and her mother to follow up with her primary care doctor in three days, and instructed them to return to the emergency room if Britteny developed a fever. *Id*.; see also Tr. 211-12.

**B.     Britteny's October 27 visit to Lawndale**

After returning home from Mt. Sinai, Britteny took three doses of the pain medication without relief.  Tr. 164-66, 170-71.  The next morning, October 27, 2003, Ms. Hardnick took Britteny to the Lawndale Christian Health Center hoping to see Britteny's regular pediatrician, Dr. Jerome Umanos.  Tr. 166, 168.

Because Dr. Umanos was not working that day, Britteny was examined by Dr. Ann Dominguez, a board certified family practice physician who was the obstetrical service line director at Lawndale.  Tr. 168-72; PX 4.  The "Walk-In Triage/History/Physical" chart of Britteny's October 27 visit to Lawndale – completed in part by a registered nurse, Elizabeth Stipp, and in part by Dr. Dominguez – noted that Britteny came to Lawndale as a follow-up to her visit to Mt. Sinai the night before and that Britteny was given ibuprofen and Sudafed without much relief.  PX 4; see also Tr. 89-90.  Britteny's chief complaints were rhinorrea, congestion, cough, headache, and sore throat for five days.  PX 4; Tr. 50.  It was noted on the chart that Britteny had a "sinus headache" and that she had "+ yellow PND" (PX 4), which Dr. Dominguez testified is a thick yellow mucus draining from the sinuses into the pharynx (Tr. 60-61).  Dr. Dominguez observed during the examination that Britteny was tired and crying, but that she was otherwise alert and cooperative.  PX 4; Tr. 53.  Dr. Dominguez also noted that Britteny had full range of motion in her neck and that although her sinuses were boggy, there was no sinus tenderness.  PX 4.  During the examination, Ms. Hardnick told Dr. Dominguez that Britteny's headache had persisted for five days and that Britteny had not felt any relief from the pain even though she had taken several doses of pain reliever.  Tr. 171-73.  Although Dr. Dominguez understood that Britteny had an intense headache, Dr. Dominguez did not specifically ask Britteny to rate the severity of the headache pain on the 10-point pain scale provided on the

chart. Tr. 106-07. Nor did Dr. Dominguez attempt to access any records from Britteny's visit the previous afternoon to Mt. Sinai Hospital (Tr. 63), despite the fact that Dr. Dominguez had privileges at Mt. Sinai and acknowledged that she likely would have received any such records as were available had she requested them (Tr. 66, 110).

After completing the examination, Dr. Dominguez diagnosed Britteny with an upper respiratory infection and prescribed an increased dosage of Motrin and a nasal spray called Flonase. PX 4. She further advised Britteny to drink a mix of fluids, including soup and juice, and to return if she felt worse or did not improve within ten to fourteen days. *Id.*

C.      **Events following the visit to Lawndale**

No change in Britteny's condition was detected for the rest of the day on October 27 or during the next day. Tr. 354. However, on October 29, Ms. Hardnick received a call at work informing her that Britteny's eye was swelling. *Id.* at 355. When Ms. Hardnick returned home, Britteny was complaining of double vision. *Id.*

That afternoon, Ms. Hardnick took Britteny back to the emergency room at Mt. Sinai. Tr. 186. At that time, Britteny was suffering from facial swelling, protosis of the eye, and had difficulty walking. *Id.* at 185-88; PX 2, at 6, 10. Britteny was admitted to the hospital's pediatric intensive care unit and administered empiric antibiotics. DX B, at 30. A CT scan of her head revealed complete opacification of the ethnoid and sphenoid sinuses bilaterally, and an MRI was suspicious for meningitis and possible bilateral retro-orbital fluid on the right side. *Id.* at 9-10. A lumbar puncture showed a white cell count 1300 with predominantly polymorphonuclear leukocytes consistent with a diagnosis of bacterial meningitis. *Id.* at 18, 30.

On October 30, the surgeons at Mt. Sinai determined that Britteny needed a surgical drainage of her retrobulbar or retro-orbital spaces and arranged for Britteny to be transferred to

University of Illinois at Chicago Hospital ("UIC"), where the surgery could be performed. PX 2, at 15-16, 23. At UIC Hospital, Britteny was diagnosed with acute sphenoid sinusitis, ethmoid sinusitis, meningitis, and bilateral orbital cellulitis and treated with intravenous antibiotics. PX 5, at 35-38; Tr. 193, 274. At approximately midnight on October 30, Britteny underwent surgery for bilateral ethmoidectomy and bilateral endoscopic sphenoid sinusotomy. *Id.* On November 1, Britteny underwent a second surgery at UIC Hospital for sinus debridement. PX 5, at 39-41; Tr. 193.

Despite the surgeries and the administration of large quantities of antibiotics, an EEG performed on Britteny on November 3 showed that she had no brain activity. PX 5, at 11-12, 244; Tr. 194. Accordingly, Britteny was removed from life support and pronounced dead on November 3, 2003. DX C, at 327-28. She was survived by her mother, Laura Hardnick, her father, Henry George, Jr., and her brother, Brandon George, who was nine years old at the time of his sister's death. An autopsy performed on Britteny identified the cause of her death as acute and chronic sinusitis, retro orbital and parasellar abscess formation, meningitis and cerebritis consistent with ascending infections process, brain edema, and changes consistent with non-perfused brain. PX 5, at 200-03; DX C, at 320-23.

### D.    Expert testimony

#### 1.    Plaintiff's experts

##### a.    Dr. Correa

At trial, Plaintiff presented the expert testimony of Dr. Armando Correa, an Assistant Professor of Pediatrics at Baylor College of Medicine who is board-certified in Pediatrics and Pediatric Infectious Diseases and has published widely in those fields. PX 19, at 1 & Ex. 1; Tr. 221-309. In his expert report, Dr. Correa opined that the constellation of symptoms that Britteny

reported – namely, severe "frontal" headache pain that worsened as she bent down, pain lasting for five days without relief from medication, nasal congestion, boggy nasal passages, yellow discharge, yellow post-nasal drip – required further evaluation beyond the prescription of additional pain medication, but that no further evaluation was undertaken at the time of Britteny's examination at Lawndale. PX 19, at 1-3. In addition to his analysis of the records of Britteny's October 26 and 27 examinations, Dr. Correa's opinions rest on his assertions that (i) intracranial complications of sinusitis are more common in teenagers than in younger children because of the more advanced anatomy and increased surface area of the frontal and sphenoid sinuses by age 13 (*id*. at 4-6; see also Tr. 281-82) and (ii) the increased pain that Britteny reported when she bent forward was associated with inflammation and increased pressure in the sinuses associated with sinusitis (*id*. at 4-5; see also Tr. 253-54).

Dr. Correa opined that the headache pain that Britteny reported on October 26 and 27 was not consistent with a diagnosis of a migraine or an upper respiratory infection, but rather was the result of sinusitis. PX 19, at 3. Among other things, Dr. Correa stated his view that the severity and persistence of the headache, despite the administration of ibuprofen, is not what a doctor would expect to see with an upper respiratory infection. Tr. 259. He believes that Britteny had sinusitis when she was examined at Lawndale on October 27, but that she did not develop bacterial meningitis until later. PX 19, at 4. Dr. Correa explained at trial that when he uses the term "sinusitis," he is talking about bacterial sinusitis, not viral sinusitis. Tr. 233.

Dr. Correa opined that Dr. Dominguez's treatment of Britteny was not in conformity with the applicable standard of care in several respects:

- Dr. Dominguez did not evaluate the etiology of Britteny's very severe headache pain which persisted for five days (PX 19, at 3);

- Dr. Dominguez did not access the chart of Britteny's visit to Mt. Sinai on October 26, despite the fact that Dr. Dominguez had privileges at Mt. Sinai (*id*. at 4);

- Dr. Dominguez did not give consideration to a consultation with a pediatrician, a pediatric infectious diseases physician, or an ENT specialist to ascertain whether antibiotics should have been prescribed on the basis of Britteny's presentation (*id*. at 5-6);

- Dr. Dominguez did not give consideration to whether a CT scan of the brain should have been undertaken given Britteny's severe headache of five days duration that was refractory to pain medication and the fact that intracranial complications of sinusitis are more common in teenagers (*id*. at 6);

- Dr. Dominguez did not make a clinical diagnosis of Britteny's condition as sinusitis – or, at a minimum, arrive at a differential diagnosis inclusive of sinusitis – at the time of Britteny's October 27 visit to Lawndale (*id*. at 5);

- Dr. Dominguez did not prescribe antibiotics for Britteny (*id*. at 6-7).

Dr. Correa stated his view that Britteny's condition was significantly complicated (Tr. 305), but that the administration of a routine dosage of antibiotics (Amoxicillin), to which Britteny was not allergic, would have adequately treated her sinusitis (PX 19, at 6-7). Put differently, Dr. Correa concluded that in all medical likelihood, if Britteny had been prescribed oral antibiotics by Dr. Dominguez on October 27, Britteny would not have developed bacterial meningitis and that her death on November 3, 2003 could have been prevented. *Id*.; see also Tr. 236, 278.

### b. Dr. Leavy

Plaintiff also provided expert opinion testimony from Dr. Phillip Leavy, an Associate Professor of Emergency Medicine at Eastern Virginia Medical School who is board-certified in Emergency Medicine. PX 21, at 1; Tr. 312-343. The opinions offered in Dr. Leavy's report track Dr. Correa's in most respects. *Id*. at 2-8. He stressed that the medical record from Mt. Sinai and Lawndale indicated that Britteny's headache had gotten worse between October 26 and October 27 (Tr. 324-28) and the fact that the headache had gotten worse, not better, despite the

administration of prescribed pain medication cast doubt on the diagnosis of URI and should have led Dr. Dominguez "to go one step or two steps further in her treatment of this patient to consider other etiologies" (Tr. 334). Like Dr. Correa, Dr. Leavy opined that Britteny had sinusitis at the time that she saw Dr. Dominguez. *Id.* at 333. And like Dr. Correa, Dr. Leavy explained that the term "sinusitis" means "bacterial sinusitis." *Id.* at 342-43.

Dr. Leavy offered at least one opinion in an area that Dr. Correa did not address, relating to Dr. Dominguez's prescription of Flonase. PX 21, at 7-8. In Dr. Leavy's view, Flonase should not have been prescribed without the administration of antibiotics, because Flonase is an immunosuppressant, which can diminish a patient's antibodies that are used to fight off infection. *Id.* at 7. In this instance, Dr. Leavy opined that the prescription of Flonase without simultaneously giving antibiotics in all likelihood increased the extension of the bacterial disease in Britteny's sinuses. *Id.* at 8.

### 2. Defendant's experts

#### a. Dr. Bielanski

Defendant offered at trial the expert testimony of Dr. Thomas Bielanski, who is board certified in Family Medicine and both practices and teaches family medicine in the Chicago area. DX E, at 1; Tr. 369-462. Dr. Bielanski worked with Dr. Dominguez during her medical residency, and in fact was her direct supervisor for a period of time. Tr, 373-74, 408.

Dr. Bielanski offered an opinion within a reasonable degree of medical certainty that Britteny more likely than not had a viral upper respiratory infection at the time that she was examined by Dr. Dominguez on October 27, 2003, and that there was no need for Britteny to have been treated with antibiotics at that time. DX E, at 3-4. He also opined that Dr. Dominguez did not deviate from the standard of care in her treatment of Britteny on that date.

*Id.* at 4. In elaborating on his opinion, Dr. Bielanski stressed that the symptoms of URI, viral infection, and acute bacterial sinusitis are all the same, and that apart from a sinus culture, which rarely is done, there is no test that a doctor can give a patient to diagnose bacterial sinusitis. Tr. 384. He also testified that, in his view, Dr. Dominguez did know the etiology of Britteny's headache at the time that she provider her diagnosis on October 27. *Id.* at 426.

On cross-examination, Dr. Bielanski acknowledged that the intensity of a headache may be significant in evaluating whether a patient has acute bacterial sinusitis, and that a physician also must "take other history, examine the patient and determine what the source of the headache is." Tr. 386. He also agreed that, in view of the autopsy's findings that Britteny had chronic sinusitis at the time of her death, it is more likely than not that Britteny had sinusitis on October 27 – although he draws a distinction between sinusitis and acute bacterial sinusitis. Tr. 415.

### b.       Dr. Segreti

Defendant also offered at trial the expert testimony of Dr. John Segreti, a Professor in the Department of Internal Medicine at Rush University Medical Center who is board-certified in Internal Medicine and Infectious Diseases. DX D, at 2; Tr. 465-508. Dr. Segreti opined that the care and treatment rendered by Dr. Dominguez on October 27, 2003 complied with the standard of care. *Id.* at 5. According to Dr. Segreti, Britteny's clinical presentation at the time that she was examined by Dr. Dominguez was most consistent with a diagnosis of upper respiratory infection and Britteny did not have the clinical picture of a patient with acute bacterial sinusitis or meningitis. *Id.*

In support of that opinion, Dr. Segreti referenced the AAP Guidelines for pediatric sinusitis. DX D, at 5. As Dr. Segreti noted, the diagnosis of acute bacterial sinusitis is based on clinical criteria in children who present with upper respiratory symptoms that are either

persistent (those lasting longer than 10 to 14 days) or severe (temperature of at least 102 degrees and purulent nasal discharge for 3 to 4 consecutive days in a child who seems ill). *Id*. at 5-6. Dr. Segreti opined that although Britteny may have had sinusitis at the time that she was examined by Dr. Dominguez, "[b]ased on this guideline, Britteny George did not meet the clinical criteria for acute bacterial sinusitis." *Id*. at 6. He also stressed that the severity of a headache does not differentiate viral from bacterial sinusitis. *Id*. at 5. Dr. Segreti believes that Britteny developed acute bacterial sinusitis some time after leaving Lawndale on October 27, and that she later developed acute bacterial ethmoid sinusitis, which was then complicated by bacterial meningitis and ultimately led to her death. *Id*. at 6.

Dr. Segreti testified that he is not aware of data that adolescents are more susceptible to complications of viral sinusitis. DX D, at 6. He opined that a consultation with an infectious disease specialist was not indicated as of October 27, nor were radiographs, CT scans, or an MRI required as of that time under the applicable standard of care. *Id*. He also stated his view that the records from Britteny's October 26 visit to Mt. Sinai simply would have confirmed Dr. Dominguez's diagnosis of viral URI. *Id*. Finally, he opined that any use by Britteny of Flonase could not have contributed to the development of acute bacterial sinusitis or meningitis in Britteny. *Id*. at 6-7.

In response to questions from Plaintiff's counsel, Dr. Segreti acknowledged that he is not board certified in pediatric infectious diseases, that he has no formal training in pediatric infectious diseases or in family practice, and no primary care experience with pediatric patients with either upper respiratory infection or acute bacterial sinusitis. Tr. 481-83. As a result of an absence of specific experience with pediatric patients, Dr. Segreti did not know at the time of his

deposition, for example, the age at which a pediatric patient's sphenoid sinuses are pneumatized. *Id*. at 486.

## II. Analysis

### A. Applicable legal standards

The Federal Tort Claims Act provides a remedy for personal injuries caused by the negligent or wrongful act or omission of a governmental employee while acting within the scope of her employment. *Kasongo v. United States*, 523 F. Supp. 2d 759, 791 (N.D. Ill. 2007); see also 28 U.S.C. §§ 1346(b)(1), 2671, 2674. In FTCA cases, the government is liable in the same manner and to the same extent as a private individual, and the law of the state in which the cause of action arose governs the scope of that liability. See *United States v. Olson*, 546 U.S. 43, 45-46 (2005); *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991). Here, it is undisputed that the substantive law of Illinois applies in this medical negligence case under the FTCA.

Under Illinois law, to establish negligence, the Plaintiff must show that (i) Defendant owed a duty of care to Plaintiff; (ii) Defendant breached that duty of care; and (iii) Defendant's breach proximately caused an injury to Plaintiff. *Curatola v. Village of Niles*, 154 Ill. 2d 201, 207 (1993). In determining whether a duty exists, the court must "consider not only the (1) reasonable foreseeability and (2) likelihood of injury, but also (3) the magnitude of the burden on defendant in guarding against injury and (4) the consequences of placing that burden on defendant." *Staples v. Krack Corp.*, 186 F.3d 977, 979 (7th Cir. 1999) (applying Illinois law).

Here, as in any negligence action predicated on alleged medical malpractice, the "central issue * * * is the standard of care against which a doctor's negligence is judged." *Curi v. Murphy*, 366 Ill. App. 3d 1188, 1199 (4th Dist. 2006). If the plaintiff fails to prove that the

doctor deviated from the standard of care, she cannot prevail. *Burrow v. Widder*, 52 Ill. App. 3d 1017, 1023 (1st Dist. 1977). To prevail, a medical malpractice plaintiff must show that the doctor failed to do something that a reasonably careful physician would do, or did something that a reasonably careful physician would not have done, under circumstances similar to those shown by the evidence in the case. See, *e.g.*, *Kwak v. St. Anthony DePadua Hosp.*, 54 Ill. App. 3d 719, 726 (1st Dist. 1977); see also *Bryant v. LaGrange Mem. Hosp.*, 345 Ill. App. 3d 565, 575 (1st Dist. 2003) ("the standard of care required of a defendant medical professional is to act as would an 'ordinarily careful professional'"). To be sure, the standard of care is not the highest degree of skill that one learned in the profession may acquire; rather, it reflects "reasonable skill such as physicians in good practice ordinarily use and would bring to a similar case in that locality." *Taber v. Riordan*, 83 Ill. App. 3d 900, 904 (2d Dist. 1980); see also *Kasongo*, 523 F. Supp. 2d at 792 ("the standard of care against which a defendant's conduct is measured is not the highest degree of skill possible, but the reasonable skill that a physician in good standing in the community would use in a similar situation") (applying Illinois law).

As both parties have acknowledged, to determine what the standard of care required in a particular set of circumstances, the trier of fact ordinarily must rely on the testimony of qualified expert witnesses. See, *e.g.*, *Purtill v. Hess*, 111 Ill. 2d 229, 242 (1986); *Dolan v. Galluzzo*, 77 Ill. 2d 279, 282 (1979); see also I.P.I. Civil Jury Instr. 105.01. In addition, to satisfy the element of proximate cause, expert testimony must establish within a reasonable degree of medical certainty that the defendant's acts (or omissions) caused the plaintiff's injury. See *Wintz v. Northrop Corp.*, 110 F.3d 508, 515 (7th Cir. 1997). "The weight given to medical expert testimony is for the trier of fact to determine." *Kasongo*, 523 F. Supp. 2d at 793.[1]

---

[1] During trial, Defendant raised a number of objections to the scope of the testimony offered by Plaintiff's expert witnesses. Defendant insisted that those witnesses presented testimony that went beyond the

Here, as in most medical malpractice cases, the parties have presented the trier of fact with a "battle of the experts." Each side has offered the testimony of two licensed and well credentialed physicians. Plaintiff's experts, not surprisingly, contend that Dr. Dominguez breached the standard of care owed to Britteny in several respects, and that those breaches proximately caused Britteny's death. Defendant's experts, equally predictably, opined that Dr. Dominguez acted in conformity with the standard of care and that other factors caused Britteny's death.

As the parties recognize, the mere fact that qualified and credentialed experts disagree on the appropriate course of treatment in a given factual scenario neither condemns nor exonerates the doctor's course of treatment. Because medicine "is not an exact science," but instead "involves the exercise of individual judgment within the framework of established procedures," a diagnosis that results in a difference of opinion nevertheless can be consistent with the exercise of due care. *Walski v. Tiesenga*, 72 Ill. 2d 249, 261 (1978); see also *Campbell v. United States*, 904 F.2d 1188, 1192 (7th Cir. 1990).

All four of the experts offered coherent explanations for their views on the standard of care and proximate cause. The Court found Dr. Correa to be a particularly persuasive witness in view of his specialization in pediatric infectious diseases and his concise testimony that was

_____

opinions stated in their pre-trial disclosures and Rule 26 expert reports and requested that any such testimony be excluded. Plaintiff made similar objections during the testimony of Defendant's experts. The Court has carefully examined the expert reports and the trial transcript to ensure that it has relied only on opinions that were fairly encompassed within the expert reports tendered in this case. While the expert reports are not as comprehensive as they might have been – a comment that applies equally to Plaintiff's and Defendant's experts – the reports contain sufficient detail as to both the opinions offered and the basis for those opinions to satisfy any foundational, relevance, and reliability concerns that have been raised by either side. Accordingly, the Court rejects Defendant's position that Plaintiff "failed to disclose or produce any expert opinion establishing that Dr. Dominguez's treatment of Britteny on October 27, 2003 deviated from the acceptable standard of care." To be sure, as noted elsewhere in this opinion, some of the experts have more relevant experience than others, a factor that the Court properly may consider in determining how much weight to accord the experts' opinions.

consistent with his expert report. And, in comparison to the other experts, the Court found Dr. Segreti's background and experience less pertinent to the matters in dispute concerning the standard of care. As noted above, among other things, Dr. Segreti is not trained in or board certified in pediatric infectious diseases and has not acted as a primary care physician for pediatric patients suspected of having either a URI or acute bacterial sinusitis. Tr. 381-83. The Court nevertheless found Dr. Segreti's testimony somewhat helpful; it simply was not as helpful as the testimony of the other opinion witnesses. The Court also found all of the opinion witnesses, as well as the other key witness, Dr. Dominguez, to be forthright and credible. At the end of the day, the resolution of this case does not turn on credibility of the witnesses, but rather on the Court's assessment, as the trier of fact, of the experts' opinions on whether the medical care and treatment provided by Dr. Dominguez on October 27, 2003 deviated from the standard of care and, if so, whether the errors or omissions in the treatment of Britteny George proximately caused her death.

### B. Breach of the standard of care

As set forth in detail above, the evidence in this case shows that when Britteny appeared at Lawndale for a medical examination on the morning of October 27, 2003, she had a severe headache. In fact, the records of Britteny's visits to Mt. Sinai (PX 1) and Lawndale (PX 4) over an 18-hour period on October 26-27, 2003 described a "constant," "throbbing," "frontal" headache and establish that the headache pain was worse when Britteny bent down. Although the physician's assistant who had examined Britteny the night before at the Mt. Sinai emergency room had diagnosed the headache as a migraine, Dr. Dominguez's notes and testimony reflect her view that Britteny had a "sinus headache." Experts for both Plaintiff and Defendant opined that Britteny probably had sinusitis at the time of her examination at Lawndale, although they

agree that the record does not support the conclusion that she had bacterial meningitis at that time. It is undisputed that the headache had lasted for several days and persisted despite the administration of three prescribed doses of pain medication. It also is clear from the testimony and documentary record that the severity of the headache pain caused Britteny to cry throughout the October 27 examination. Finally, in addition to head pain, the examination notes from the morning of October 27 state that Britteny had boggy nasal passages and thick yellow mucus draining from her sinuses into her pharynx.

Presented with that constellation of symptoms, some of which Dr. Dominguez observed and others of which could have been known to her if she had accessed the records of Britteny's visit to Mt. Sinai Hospital the previous afternoon, Dr. Dominguez agreed with diagnosis made at Mt. Sinai the prior afternoon that Britteny was suffering from a URI and prescribed additional pain medication. Dr. Dominguez also prescribed a nasal spray called Flonase, advised Britteny to drink a mix of fluids, including soup and juice, and directed her return to the clinic if she felt worse or did not improve within ten to fourteen days.

In opening statements and through the testimony of its expert witnesses, Defendant suggested that Dr. Dominguez's diagnosis and prescribed course of treatment were consistent with the approach set forth in the AAP Guidelines. The AAP Guidelines formulate recommendations for health care providers concerning the diagnosis, evaluation, and treatment of children with "uncomplicated acute, subacute, and recurrent acute bacterial sinusitis." DX E, Tab 2, at 1 (Bielanski 0017). According to the Guidelines, a diagnosis of acute bacterial sinusitis is based on clinical criteria in children who present with upper respiratory symptoms that are either "persistent" (defined as those that last longer than 10 to 14, but less than 30, days) or "severe" (defined as including a temperature of at least 102 degrees and purulent nasal discharge

present concurrently for at least 3 to 4 consecutive days in a child who seems ill). *Id*. at 3 (Bielanski 0019). Also of note, the Guidelines state that complications of acute bacterial sinusitis usually involve the orbit, the central nervous system, or both. *Id*. at 8 (Bielanski 0024). The AAP Guidelines recommend that signs of increased intracranial pressure (headache and vomiting) or nuchal rigidity require immediate CT scanning (with contrast) of the brain, orbits, and sinuses to exclude intracranial complications. *Id*. at 9 (Bielanski 0025). And while the Guidelines "promote the judicious use of antibiotics" and discourage the overuse of antibiotics (*id*. at 5 (Bielanski 0021)), they do recommend that doctors promptly and aggressively prescribe antibiotics to treat children with complications or suspected complications of acute bacterial sinusitis (*id*. at 5-6, 8-9 (Bielanski 0021-22, 0024-25)).

The Court has reviewed the testimony concerning the AAP Guidelines, as well as the Guidelines themselves. Even if the Court were to agree that Dr. Dominguez evaluated and diagnosed in a manner consistent with the recommendations set forth in the Guidelines, the Guidelines expressly state – as the experts confirmed – that they apply only to "uncomplicated" cases. The Guidelines further stress that they are "not intended as a sole source of guidance in the diagnosis and management of acute bacterial sinusitis in children" or "to replace clinical judgment or establish a protocol for all patients with this condition." DX E, Tab 2, at 1 (Bielanski 0017). In addition, as Dr. Bielanski confirmed, the Guidelines themselves do not establish a medical standard of care and do not specifically address children who present with an intense or very severe headache that has been refractory to pain mediation. Tr. 449-50.

On the basis of the evidence at trial and Dr. Correa's and Dr. Leavy's expert testimony, the Court concludes Britteny did not present an "uncomplicated" case on the morning of October 27. Instead, the information available to Dr. Dominguez from (i) her own observation and

interaction with Britteny and her mother, (ii) the notes recorded on Britteny's chart that morning by Nurse Stipp at Lawndale, and (iii) the Mt. Sinai records from the previous evening – which Dr. Dominguez acknowledges she probably could have accessed had she attempted to do so (Tr. 66, 110) – reveals a number of complicating factors. Most significantly, Britteny's condition was significantly complicated by the very severe, unrelenting headache pain that had lingered for several days, had proven refractory to pain medication, and was worse when Britteny leaned forward. While Dr. Dominguez's diagnosis and course of treatment may have been appropriate for an "uncomplicated" case involving nasal drainage, the Court concludes that the standard of care required a "reasonably careful physician" to undertake a more careful assessment given the particular circumstances of Britteny's condition at the time of the October 27 examination at Lawndale. See, *e.g.*, *Arpin v. United States*, 521 F.3d 769, 774 (7th Cir. 2008) (holding in wrongful death action under FTCA arising from alleged medical malpractice that standard of care had been breached where physicians had "a duty to conduct a competent search for the cause of a patient's symptoms, which they failed to do").

The Court concludes that, in particular, Dr. Dominguez deviated from the standard of care in failing to attempt to access the Mt. Sinai chart and in omitting to ask Britteny (or even her mother) to rate her pain on the pain scale. In so doing, Dr. Dominguez deprived herself of important clinical data that likely would have compelled a different course for Britteny's diagnosis and treatment. Most significantly, the Mt. Sinai records show that Britteny's headache pain worsened when she bent over, which Dr. Dominguez acknowledged could be significant as an indication of fluid in the sinuses. Tr. 109. The failure to gather all of the significant information that was available at the time – which, in turn, likely contributed to Dr. Dominguez's willingness to rest on the diagnosis of URI instead of undertaking a more rigorous analysis of the

etiology of Britteny's severe headache, including, at a minimum, a differential diagnosis that included sinusitis – fell below the standard of care. See *Kasongo*, 523 F. Supp. 2d at 796. In that regard, the Court notes that not only did Dr. Correa and Dr. Leavy opine that a differential diagnosis inclusive of sinusitis was indicated by Britteny's presentation on October 27, but even Dr. Bielanski stated that after a physician learns the intensity of the patient's headache, "it's up to the physician to take other history, examine the patient and determine what the source of the headache is." Tr. 386. In addition, the expert testimony that intracranial complications of sinusitis are more common in teenagers further supports the conclusion that a "reasonably careful physician" should have at least included sinusitis on a differential diagnosis of Britteny's condition. In sum, in view of Dr. Correa's persuasive testimony that the duration and intensity of Britteny's headache pain and the presence of boggy nasal passages and yellow discharge were not consistent with a diagnosis of upper respiratory infection, and in fact reflected warning signs of sinusitis in a thirteen year old patient, the Court is persuaded that Dr. Dominguez breached the standard of care in this case.

The Court further is persuaded by the testimony of Plaintiff's experts that, given the presentation of a patient with a "frontal" "sinus" headache of several days duration that was refractory to pain medication and the other symptoms noted above, it was a breach of the standard of care not to prescribe antibiotics. The Court acknowledges the testimony and the concerns noted in the AAP Guidelines regarding the risks of overprescribing antibiotics. However, both the experts and the Guidelines agree that children with complications or even suspected complications of acute bacterial sinusitis should be treated promptly and aggressively, including with antibiotics. Although Plaintiff's experts are not willing to say that Britteny had acute bacterial sinusitis on the morning of October 27, they have shown convincingly that, at a

minimum, the standard of care required (i) the inclusion of sinusitis in a differential diagnosis, (ii) further analysis of the etiology of Britteny's headaches, and (iii) the prescription of antibiotics given the warning signs of sinusitis that were present at that time.

## C. Causation

The next question is whether the breaches of the standard of care proximately caused the injuries for which Plaintiff seeks damages. Proximate cause is defined as "'that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the results would not have occurred." *FDIC v. Bierman*, 2 F.3d 1424, 1434 (7th Cir. 1993). Proximate cause is not established where the causal connection between the allegedly negligent act or omission and the injury is contingent or speculative or if the injury would have occurred even in the absence of that act of omission. *Campbell v. United States*, 904 F.3d 1188, 1193-94 (7th Cir. 1990). Rather, Plaintiff must show by a preponderance of the evidence that Defendant's failure to comply with the applicable standard of care caused or contributed to the injury giving rise to Plaintiff's cause of action. *Wise v. St. Mary's Hosp.*, 64 Ill. App. 3d 587, 589 (1st Dist. 1978); see also *Kasongo*, 523 F. Supp. 2d at 802 (defining causation inquiry as whether "the defendant's breach of the applicable standard of care more probably than not caused [the plaintiff's] injury"). The breach of the standard of care need not be the only cause of the injury, for there can be more than one proximate cause of an injury. See *Durbin v. St. Louis Slag Prods. Co.*, 206 Ill. App. 3d 340, 357 (4th Dist. 1990); see also I.P.I. Civil Jury Instruction 15.01.

It appears that the experts are in agreement that an antibiotic such as Amoxicillin is very effective in treating acute bacterial sinusitis. The Court is persuaded by Dr. Correa's opinion, offered with a reasonable degree of medical certainty, that if Britteny had been prescribed an

antibiotic like Amoxicillin, she would not have developed bacterial meningitis and her death on November 3 probably would have been prevented. According to Dr. Correa, the timely administration of antibiotics would have prevented the sinusitis that Britteny likely had on the morning of October 27 from developing into bacterial meningitis through the ascending infectious process noted in the autopsy results.

While Dr. Bielanski opined that antibiotics were not indicated at the time that Dr. Dominguez examined Britteny, both he and Dr. Dominguez concurred in the view that antibiotics ordinarily are appropriate in treating and effective in combating acute bacterial sinusitis. Tr. 62, 453. Dr. Bielanski, in fact, testified that none of the hundreds or thousands of patients with sinusitis whom he has treated with antibiotics has died. *Id*. at 409-10, 449. And the medical record does not support a finding that it was too late to administer antibiotics on October 27. To the contrary, as of that date, Britteny was not febrile, nor did she have any neurologic findings of bacterial meningitis.

In sum, the Court concludes that Plaintiff has sufficiently established that the breaches of the standard of care described above proximately caused Britteny's death. Therefore, the Court finds Defendant liable on Plaintiff's claim for medical negligence and wrongful death. *Kasongo*, 523 F. Supp. 2d at 802 (imposing liability on the government where the Court held that "the defendant's breach of the applicable standard of care more probably than not caused [the plaintiff's] injury").

### D. Damages

Damages in FTCA actions may not exceed the amount of the Plaintiff's administrative claim. See *Erxleben v. United States*, 668 F.2d 268, 273 (7th Cir. 1981); 28 U.S.C. § 2675(b). In this case, the administrative claim sought $5,500,000.00 in damages. Plaintiff has not

requested an award in excess of her administrative claim. Rather, Plaintiff seeks a total award of $3,500,000 under the Illinois Wrongful Death Act and an award of $250,000 under the Illinois Survival Act for the conscious pain and suffering endured by Britteny during her hospitalization.[2] Plaintiff requests that the total award under the Wrongful Death Act be divided among Britteny's three surviving family members – her mother, Laura Hardnick, her father, Henry George, and her brother, Brandon George.

### 1.    Wrongful Death Act

The purpose of the Illinois Wrongful Death Act is to compensate the parents and siblings of the deceased family member for pecuniary losses resulting from her death. See, *e.g.*, *Elliot v. Willis*, 92 Ill. 2d 530, 540 (1982). Compensable losses include loss or deprivation of support (such as money, benefits, goods, and services) and loss of society (such as companionship, guidance, advice, love, and affection). See *Bullard v. Barnes*, 102 Ill. 2d 505, 514 (1984). While the law presumes that a parent suffers a substantial pecuniary loss from the loss of a child's society (*Ballweg v. City of Springfield*, 114 Ill. 2d 107, 120 (1986)), that presumption does not apply to siblings (*In re Estate of Finley*, 151 Ill. 2d 95, 103 (1992)).

In assessing the appropriate measure of damages, Plaintiff contends that the Court should not consider the amounts awarded in comparable cases. Instead, Plaintiff insists that under Illinois law, the Court should be guided only by the rule that a damages award cannot be so excessive as to "shock the judicial conscience." However, as a backup position, Plaintiff

---

[2] In 2005, the Illinois General Assembly enacted legislation capping noneconomic damages in malpractice cases at $1 million for hospitals and hospital affiliates and $500,000 for physicians and other health care professionals. See *Arpin*, 521 F.3d at 775; *Kasongo*, 523 F. Supp. 2d at 803 n.38. However, that law does not apply to causes of action that accrued before the effective date of the legislation – August 25, 2005 – and thus has no bearing on this case. In addition, a state trial court judge has invalidated the law, and the Illinois Supreme Court has heard oral argument in the appeal of the trial court's ruling. See *Lebron v. Gottlieb Mem. Hosp.*, Nos. 105741 & 105747 (consol.) (argued Nov. 13, 2008).

describes several cases in which the plaintiffs were awarded substantial damages in what she believes are factually analogous circumstances.

Defendant counters with two arguments. First, Defendant submits that controlling Seventh Circuit law clearly permits – and even encourages – the use of comparables in determining an award of non-economic damages. Second, Defendant contends in the alternative that the Court could award a "single-digit multiple" of the amount of compensatory damages – which in this case essentially consist principally of the medical bills for Britteny's treatment in the week prior to her death.[3] Under either approach, Defendant contends that the sum sought by Plaintiff cannot be sustained.

For a number of reasons, the Court concludes that Defendant has the better of the argument on the use of comparables, but that at the end of the day the most closely analogous verdicts support an award of damages closer to what Plaintiff has requested than to what Defendant contends is reasonable. To begin with, unlike in a jury trial, after a bench trial the trier of fact (the judge) "is required to explain the grounds of his decision" to comply with the dictates of Federal Rule of Civil Procedure 52(a), which imposes a "duty of reasoned, articulate adjudication." *Arpin*, 521 F.3d at 776. "'This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion.'" *Id.* (quoting *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001)). When faced in *Arpin* with an instance in which the district judge did not comply with Rule 52(a) in explaining the basis for a damage award, the Seventh Circuit flatly stated that "[t]he judge should have considered awards in similar cases, both in Illinois and elsewhere." *Id.* In providing that guidance, the Seventh Circuit acknowledged that Illinois law "does not require or even

---

[3] The Court agrees with Plaintiff that the multiplier alternative suggested by Defendant does not make sense in a case involving a thirteen year old child and that any award calculated in such a fashion would undercompensate Britteny's family.

encourage such comparisons" and that in suits under the FTCA, "the damages rules of the state whose law governs the substantive issues in the case bind the federal court." *Id*. However, the court of appeals went on to explain that "whether or not to permit comparison evidence in determining the amount of damages to award in a particular case is a matter of procedure rather than of substance, as it has no inherent tendency * * * either to increase or decrease the average damages award." *Id*. Instead, examination of "comparables" only serves "to reduce variance." *Id*. The bottom line, therefore, is that the most recent pronouncement of the Seventh Circuit strongly encourages district courts in cases like this one – wrongful death actions under the FTCA involving alleged medical negligence – to consider damages awards in comparable cases. See, *e.g.*, *Kasongo*, 523 F. Supp. 2d at 804, 807-12 (citing *Jutzi-Johnson* and examining comparable verdicts in determining damages in FTCA case under Illinois Wrongful Death and Illinois Survival Acts).[4]

Both parties have submitted a number of "comparables" for the Court's consideration. Plaintiff has provided nine comparable verdicts, three of which she acknowledges involved decedents who either were significantly older (22 and 19) or younger (16 days) than Britteny. Of the six cases involving medical negligence death claims of children between the ages of 9 and 14, the average award was $6.0 million. If the Court were to look only at the comparables in the cases cited by Plaintiff in which damages for loss of society were awarded to parents and one sibling, the average verdict again was $6.0 million.

---

[4] The Court draws no distinction between bench and jury trials in regard to its consideration of comparable verdicts. See *Zurba v. U.S.*, 247 F. Supp. 2d 951, 962 (N.D. Ill. 2001) (rejecting the government's argument that "jury verdicts should be used with great caution" in determining comparable damage awards on the grounds that (a) "the government's waiver of sovereign immunity provided by the FTCA allows only for bench trials," (b) "[t]he government has cited no authority for this proposition, nor is the Court aware of any," (c) "in *Jutzi-Johnson*, the Seventh Circuit cited several jury awards as comparable to the claim in that case," and (d) "there is no hard-and-fast rule that juries make higher awards than judges").

Defendant takes issue with Plaintiff's comparables, suggesting that Plaintiff has cherry-picked "record verdicts" that are not a representative cross section of damage amounts in similar cases. Defendant has submitted four "bacterial meningitis" cases, but all four ended in settlements rather than verdicts. As Plaintiff argues, and other courts have observed, settlements are "less useful than consideration of verdicts" because "[p]arties settle claims to avoid the uncertainty and expense of trial; and the amount settled for may bear little relation to the amount a jury might award upon finding a defendant liable." *Kasongo*, 523 F. Supp. 2d at 804 n.39; see also *Jutzi-Johnson*, 263 F.3d at 759 (urging that the trier of fact be informed of the amounts of damages awarded in similar cases). Defendant submitted six additional wrongful death comparables, four of which ended in verdicts with awards ranging from $1 million to $4.125 million. However, as Plaintiff points out, only two of the verdicts were rendered in medical negligence cases and one of those two verdicts was subject to a statutory cap on damages of $1.5 million. Thus, only one of the comparables cited by Defendant involved a non-capped damages award after a verdict in a medical negligence action, and in that case the award was $4.125 million, of which $3.5 million was for loss of society.

Excluding the settlements cited in Defendant's brief, the comparable verdicts cited in the parties' briefs range from $1.0 million to $11.0 million, with the most comparable cases (example 5 in Defendant's brief and examples 8 and 9 in Plaintiff's brief) ranging from $3.5 to $6.0 million. In view of the wide range of comparables and the absence of any case directly on point – that is, a verdict involving acute bacterial sinusitis in a teenager – the Court concludes that Plaintiff's request for an award of $3.5 million in damages for loss of society is fair and reasonable, and certainly not excessive. The Court also concludes that the individual awards of $2.0 million for Ms. Hardnick, $1.0 million for Mr. George, and $500,000 for Brandon George

24

likewise are fair and reasonable. In regard to Ms. Hardnick and Mr. George, the testimony showed the especially close relationship that Britteny shared with her mother and, as noted above, there is a presumption that parents suffer a substantial pecuniary loss from the loss of a child's society. See *Ballweg*, 114 Ill. 2d at 120; *In re Estate of Finley*, 151 Ill. 2d at 103. As to Brandon, notwithstanding the absence of a presumption as to siblings, it is clear from the testimony that Brandon was very close to his sister, that her death caused a great void in his life, and that he therefore is entitled to a substantial award as well.

### 2. Survival Act

Under the Illinois Survival Act, damages may be recovered for the decedent's conscious pain and suffering sustained until the time of her death. See *Murphy v. Martin Oil Co.*, 56 Ill. 2d 423, 432 (1974); *Kasongo*, 523 F. Supp. 2d at 810. The fact that the decedent suffered for only a short period of time before her death is not a bar to a claim under the Survival Act. See *Glover v. City of Chicago*, 106 Ill. App. 3d 1066, 1072 (1st Dist. 1982); *Kasongo*, 523 F. Supp. 2d at 810. In reviewing a number of survival awards in comparable cases, the court in *Kasongo* observed "a significant variance in survival damages for pain and suffering" and a general trend "suggest[ing] that the award increases with the length of time that pain is suffered." *Id.* at 812. Plaintiff points to four cases that she contends are comparable. In those cases, the average survival award was $2.18 million and even excluding the largest such award, the average award was $1.5 million. The Court also considers the $1 million award of survival damages in *Kasongo*, 523 F. Supp. 2d at 811-12, a medical negligence case under the FTCA in which the plaintiff experienced pain and suffering over a twenty-four day period between the date on which her care providers first breached the standard of care and the date of her death.

Plaintiff has requested an award of $250,000 for Britteny's survival claim. Plaintiff stresses that she seeks compensation for Britteny's pain, suffering, and emotional distress only during the time that she was "conscious, alert and cognizant of her impending death." In consideration of the comparable survival verdicts and the specific facts of this case, the Court finds that the award requested by Plaintiff is fair and reasonable. Although Britteny's illness was relatively short and she lost consciousness a day and a half before her death, she endured repeated operations and undoubtedly did suffer considerable pain and distress from the headaches, swelling, and other physical difficulties detailed in the medical records and autopsy report. For these reasons, the Court awards Plaintiff $250,000 on the survival claim brought on Britteny's behalf.

## III.    Conclusion

As Judge Pallmeyer wrote in similar circumstances, FTCA claims involving alleged medical negligence can be "exceedingly challenging" (*Kasongo*, 523 F. Supp. 2d at 812), particularly because medicine "is not exact science" and qualified expert witnesses have presented the Court with differing views on the adequacy of the medical treatment at issue in this case. In addition, having observed Dr. Dominguez on the witness stand and listened to her testimony, the Court has no doubt that she is a dedicated professional who desires to give her patients the best possible care. However, on the basis of the evidence and the expert testimony presented at trial, the Court is persuaded that, in this instance, Dr. Dominguez's treatment of Britteny George on October 27, 2003 did not comport with the standard of care and was a proximate cause of the tragic events culminating in Britteny's death on November 3, 2003. Accordingly, the Court enters judgment for Plaintiff and against Defendant on Plaintiff's Wrongful Death and Survival Act claims and awards a total of $3,500,000 on the Wrongful

Death claim (divided as $2,000,000 to Laura Hardnick, $1,000,000 to Henry George, Jr., and $500,000 to Brandon George) and further awards $250,000 to the Estate of Britteny George on the Survival Act claim.

Dated:  June 25, 2009

_____
Robert M. Dow, Jr.
United States District Judge